**LOCKWOOD BROS., INC., Plaintiff,**

v.

**McALLISTER BROS., INC., Defendant,**

v.

**HORNE BROS., INC., Third-Party Defendant.**

and

**HORNE BROS., INC., Plaintiff,**

v.

**McALLISTER BROS., INC., Defendant,**

v.

**LOCKWOOD BROS., INC., Third-Party Defendant.**

**Civ. A. Nos. 117–69–NN; 118–69–NN.**

United States District Court, E. D. Virginia, Newport News Division.

July 13, 1970.

J. Davis Reed, III, Norfolk, Va., for plaintiffs.

R. M. Hughes, III, Norfolk, Va., for defendant.

Arthur Jett, Jr., Norfolk, Va., for third-party defendants.

## MEMORANDUM OPINION

MacKENZIE, District Judge.

In these two civil actions, consolidated for trial, Horne Bros., Inc., and Lockwood Bros., Inc., seek to recover from McAllister Bros., Inc. damages sustained by Horne Bros. Barge No. 2 and a Lockwood Bros. crane, allegedly caused by the wake of the defendant's tug, ISABELLE A. McALLISTER, on 24 June 1969.

The accident occurred as the barge, and the truck crane which was temporarily mounted thereon, were being used to set in place the heavy bow door of a Navy LST alongside the Horne Bros. pier at its ship repair facilities in the James River at Newport News, Virginia. The ISABELLE A. McALLISTER was proceeding upstream in the river opposite the pier.

\* \* \*

## FINDINGS OF FACT

(1) At or about 12 o'clock noon, on 24 June 1969, a forty-ton mobile truck crane owned by Lockwood under lease to Horne was mounted upon Horne Bros. Barge No. 2 moored on the north side of the Horne pier, which stretches westward into the James River at Newport News, Virginia.

(2) The truck crane and barge were being used in certain repair work on the bow door of the USS SUFFOLK COUNTY, an LST, which was also moored along the north side of the Horne pier aforesaid.

(3) At the same time, the tug, ISABELLE A. McALLISTER, owned by the defendant, McAllister Bros., Inc., a vessel 103.4 feet in length, with a beam of 30 feet, drawing 14½ feet, of 2400 horsepower, was proceeding in a northwardly direction upstream in the James River off the end of the Horne pier. In so proceeding, the tug created a bow wave three to four feet high, which passed down the length of the Horne pier to the point where the work was being accomplished and caused the LST and the barge and crane to rise and fall rather violently.

(4) At that precise moment, the crane, mounted on the barge, was lifting a heavy bow door of the LST, weighing 28 tons and made fast to the 60-foot boom of the crane. Four platform outriggers, two on either side of the crane, were properly down and in place against the deck of the barge and the crane was further chocked and braced with steel cables. The Court specifically finds that the crane was properly mounted.

(5) At that time, the heavy door suspended from the boom was being hung in its hinges by pins and, in fact, the lower pin was in place.

(6) As the swell created by the ISABELLE A. McALLISTER swept down the dock, the vessel, on the one hand, and the barge and crane, on the other, were caused to move out of phase with each other and the taut steel cable and block on the crane were overstrained and gave away, causing the boom to fall back across the barge.

(7) It is not disputed that the ISABELLE A. McALLISTER did in fact cause the swell. The height thereof is variously estimated at from two feet to five feet. The credible evidence, accepted by the Court, is that the wave was three to four feet high.

(8) That the damages which occurred to Horne Bros. Barge No. 2 and the Lockwood crane were caused by the wave, or swell, from the ISABELLE A. McALLISTER.

(9) That at the time of the accident there was nothing to block the view of the captain of the ISABELLE A. McALLISTER of the work being accomplished on the north side of the Horne pier.

(10) The testimony of the tug master, Captain R. C. Garcia, is condemning to the defendant:

(a) He stated that he was familiar with the Horne pier and the fact that repair work was often done there.

(b) He agreed that he usually ran by the area at 190 rpms (12½ knots), but that he would slow down if he had "notification of some kind of work going on * * *." On this occasion, he says he had slowed from 190 rpms to 155 rpms because of other work he saw being done on another pier farther to the south. He could not say what wake his tug created on this particular occasion because he did not look to determine anything about the wake as he passed this pier.

(c) On this occasion, he was not paying any attention to the Horne pier, or work being accomplished there, and he did not know what types of vessels were moored there. And this, in spite of the fact that one such vessel was the SUFFOLK COUNTY, approximately 450 feet long with a 60-foot beam, two tugs and the barge with the crane thereon, which had a 60-foot boom extending therefrom.

(d) He agrees, on cross-examination, that if he had known that a crane was working on the bow of an LST at Horne Bros., that he would have slowed down even further.

(e) He agrees that at the speed that he was proceeding that his wake could have been as much as three feet.

(f) He further agrees that it would be prudent for the captain of a tug boat to look at the piers as he proceeds up the river. It makes no difference that the captain might have been misled to believe that the crane was on the pier itself, since he agrees that he did not look or see any crane at all.

(g) Captain Garcia did not post any lookouts, though he had a mate and deckhand for this purpose.

(11) Picture exhibits of the pier taken immediately after the accident from a position in the James River approximating the ISABELLE A. McALLISTER indicate that the Horne pier and the several vessels alongside were clearly visible and that there was a clear and unobstructed view of the bow area of the LST where the difficulty occurred.

(12) While Captain Garcia places his tug 450 feet off the pier, in view of his statements as to failure to observe, or to see, if he did observe, it is entirely more likely that his vessel passed approximately 150 feet offshore of the pier as testified to by five other witnesses.

(13) That as a result of the accident, the crane was out of service 38 days, only 27 of which could be attributed to the repairs necessitated by this accident; that the crane has a usual rental of $250.00 per day; that the work at Horne being accomplished by this crane was undertaken by other equipment owned by Lockwood Bros. and for which they had been paid. It is stipulated that the physical repairs to the crane amounted to $7,696.41; that the physical damage to the barge owned by Horne Bros. amounted to $75.00 and that Horne Bros., in addition thereto, paid the sum of $610.00 as expenses for the cost of a diver and labor and materials necessitated by the accident.

Plaintiff, Lockwood, claims $250.00 per day for the 27 days of "down" time for the crane. Many factors mitigate against a full allowance of "down" time, including (a) failure to show that all of the time was actually lost by Lockwood; (b) admittedly, Lockwood cranes show an average of only 80% use during availability; (c) all Lockwood cranes showed less activity in the year of suit; and (d) specific items such as fuel expended, etc., as an expense of operation was not shown.

* * *

## CONCLUSIONS OF LAW

(1) That the ISABELLE A. Mc-ALLISTER was at fault in that she negligently failed to maintain a proper lookout, failed to stay a safe distance offshore from the pier while creating the wake which caused the damage, and proceeded too fast under the circumstances.

(2) That the plaintiff, Horne Bros., Inc., was not guilty of any negligence.

(3) That the plaintiff, Lockwood Bros., Inc., was not guilty of any negligence.

(4) That the plaintiff, Horne Bros., Inc., recover of the defendant, McAllister Bros., the sum of $685.00.

(5) That the plaintiff, Lockwood Bros., Inc., recover from the defendant, McAllister Bros., Inc., as damages for the repair of the crane the sum of $7,-696.41, and further recover from the said defendant the sum of $3,500.00 for the loss of use thereof.

(6) That counsel for the plaintiff will prepare proper judgment orders referring to and in accord with this Memorandum Opinion.